O

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| HICHAM ALDARWICH,<br><br>      Plaintiff,<br><br><br>v.<br><br><br>MARK HAZUDA,<br><br>      Defendant. | Case No.: SA CV 15-0755-DOC (RNBx)<br><br><br><br>ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT [25] [26] |

Before the Court are Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") (Dkt. 25) and Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment (Defendant's Motion") (Dkt. 26)[1] (collectively, "Cross Motions for Summary Judgment").

## I.   Background

Plaintiff Hicham Aldarwich ("Aldarwich" or "Plaintiff") asserts the United States Citizenship and Immigration Services ("USCIS" or "Defendant")[2] improperly denied his application for adjustment-of-status from asylee to lawful permanent resident on nondiscretionary grounds. Specifically, Plaintiff contends "the denial of his adjustment of status pursuant to 8 U.S.C. § 1182(a)(3)(B) is improper and illegal as it rests on the same facts previously considered by the Immigration Judge and that the determination that he did not provide material support for terrorism is barred by the doctrine of *res judicata*." Complaint ("Compl.") (Dkt. 1) ¶ 19; *see also* Pl. Mot. at 4. Therefore, the central dispute between the parties is whether collateral estoppel applies to the issue of Aldawich's involvement in terrorist activity.

### A. Statutory Framework

#### 1.   Asylum

"8 U.S.C. § 1158 governs the process by which a foreign national may apply for asylum." *Khan v. Johnson*, No. 214CV06288CASCWX, 2016 WL 429672, at *2 (C.D. Cal. Feb. 1, 2016). Pursuant to 8 U.S.C. § 1158(a)(1), "[a]ny alien who is physically present in the United States or who arrives in the United States . . . may apply for asylum." For an Immigration Judge ("IJ") to grant an application for asylum, the individual's application must demonstrate that he or she qualifies as a "refugee." 8 U.S.C. § 1158(b)(1)(A). "To establish that the application is a refugee within the meaning of [8 U.S.C. § 1101(a)(42)(A)], the applicant must establish that race, religion, nationality, membership in a particular social group, or

---

[1] Defendant's brief is both a Motion for Summary Judgment and an Opposition to Plaintiff's Motion.
[2] Plaintiff specifically names Mark Hazuda ("Hazuda"), Director of the Citizenship and Immigration Services, Nebraska Service Center, as the defendant in his Complaint. The Court will refer to Hazuda as "USCIS" or "Defendant."

political opinion was or will be at least one central reason for persecuting the application." 8 U.S.C. § 1158(b)(1)(B)(i).[3]

Section 1158(b)(2) provides a number of exceptions or statutory bars, which, if applicable, preclude the grant of asylum. Relevant here, one of these statutory bars states asylum will be denied if the Attorney General determines "the alien is described in subclause (I), (II), (III), (IV), or (VI) of section 1182(a)(3)(B)(i) of this title, or section 1227(a)(4)(B) of this title (relating to terrorist activity)." 8 U.S.C. § 1158(b)(2)(A)(v).

In addition, § 1158(c)(2) provides that asylum "does not convey a right to remain permanently in the United States, and may be terminated if the Attorney General determines that," for example, "the alien meets a condition described in subsection (b)(2)." 8 U.S.C. § 1158(c)(2)(B).

## 2.    Adjustment of Status and Terrorism-Related Inadmissibility Grounds

After an applicant has been granted asylum, 8 U.S.C. § 1159 governs the process by which an asylee may apply for an adjustment of citizenship status to "permanent resident." Under that section, "[t]he Secretary of Homeland Security or the Attorney General, in the Secretary's or Attorney General's discretion . . . may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who," *inter alia*, "has been physically present in the United States for at least one year after being granted asylum," "continues to be a refugee within the meaning of section 1101(a)(42)(A)," and "is admissible . . . as an immigrant under this chapter at the time of examination for adjustment of such alien." 8 U.S.C. § 1159(a)(2)(B)(1)–(5).

8 U.S.C. § 1159(c), in turn, refers to 8 U.S.C. § 1182, which defines ten categories of individuals who are ineligible for admission to the United States. Relevant here, one of these categories includes individuals who "ha[ve] engaged in a terrorist activity." 8 U.S.C. § 1182(a)(3)(B)(i)(I). The phrase "[t]errorist activity" includes:

---

[3] Under 8 U.S.C. 1101(a)(42)(A), a refugee is defined as a person who is unable or unwilling to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."

> [A]ny activity which is unlawful under the laws of the place where it is committed . . . and which involves any of the following . . . (V) the use of any . . . (b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with the intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property. (VI) A threat, attempt, or conspiracy to do any of the foregoing.

8 U.S.C. § 1182(a)(3)(B)(iii)(V)–(VI). The term "engage in terrorist activity" means:

> [I]n an individual capacity or as a member of an organization . . . (VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training . . . (dd) to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

8 U.S.C. § 1182(a)(D)(iv)(VI)(dd).

In addition, "[t]errorist organization[s]" fall into two categories: designated and undesignated. *See* 8 U.S.C. § 1182(a)(3)(B)(vi). An undesignated terrorist organization, the category relevant to the instant case, is referred to as a Tier III organization and defined as a "group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv)." 8 U.S.C. § 1182(a)(3)(B)(vi)(III). "Decision makers, such as Immigration Judges, may . . . find, based on the facts of a given case, and in light of the criteria set forth in the [Immigration and Nationality Act], that a particular group is an undesignated terrorist organization." *Khan*, 2016 WL 429672, at *4 n.3 (citation omitted).

### B.  Factual Background

Except where noted, the following facts undisputed and taken from the Certified Administrative Record ("CAR") in this matter, which has been lodged with the Court (Dkt. 24).

### 1.     Removal Proceedings and Asylum Application

Aldarwich is a native and citizen of Lebanon. CAR 166. On December 26, 2002, Aldarwich attempted to enter the United States while concealed in the trunk of a vehicle, but was apprehended by inspection officers. *Id.* at 145. During an oral interview at the Mexican Border, *id.* at 165, Aldarwich made a sworn statement to an immigration inspector that: "The Hezbollah party would probably torture me if they found out that I wanted to go to the United States. The Hezbollah party and the Syrian party in Lebanon would probably torture me. Because I lived in Southern Lebanon, the Hezbolla[h] would think that I'm a spy and that I worked for the Israeli government," *id.* at 167–68. On January 10, 2003, an immigration officer conducted a credible fear interview of Aldarwich. *Id.* at 107. He was found to have a credible fear of returning to his native country. *Id.*

On January 13, 2003, Aldarwich was served with a Notice to Appear in removal proceedings. *Id.* at 196. The Notice to Appear stated; "it is charged that you are subject to removal from the United States pursuant to . . . Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act . . . as an immigrant who, at time of the application for admission, is not in possession of" valid travel and identification documents. *Id.* Aldarwich admitted the allegations against him and conceded removability at the master calendar hearing in immigration court on January 27, 2003, and again at the master calendar hearing on May 15, 2003. *Id.* at 26, 107. On January 27, 2003 Aldarwich requested asylum, withholding of removal, protection under the Convention Against Torture, and alternatively, voluntary departure. *Id.* at 107.

On May 15, 2003, Aldarwich timely applied for asylum by submitting a Form I-589, Application for Asylum and for Withholding of Removal, to the San Diego Immigration Court. *Id.* at 175–76. In the Form I-589, Aldarwich stated he was seeking asylum or withholding of removal based on religion, political opinion, membership in a particular social group, and the Torture Convention. *Id.* at 180. In response to the question asking whether "you, your family,

or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone," Aldarwich answered "[y]es." *Id.* By way of explanation, Aldarwich stated:

> From 1997, I acted as a spy for the Israeli/South Lebanese Army in South Lebanon. I gave information about opponents of Israel and about Hezbollah. My information prevented Hezbollah ambushes. In October 2001, the Lebanese government Imad Yassein [sic], who identified me as a spy. Hezbollah also got the information. It thugs [sic] came looking for me [i]n my village the summer of 2002. I fled. They would kill me. And the Leb. govt. would arrest and torture me for being a spy.

*Id.*

Aldarwich also answered "[y]es" when asked whether "you fear harm or mistreatment if you return to your home country." *Id.* He asserted, for example, "I fear death or serious injury from Hezbollah and the Lebanese government. The government is arresting, jailing, and beating/torturing those who collaborated with the Israeli forces during the incursion into South Lebanon. Hezbollah is almost omnipotent throughout Lebanon and would kill me if they find [sic] me." *Id.*

Aldarwich also responded "[y]es" to the following question: "Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerilla organization, ethnic group, human rights group, or the press or media?" *Id.* at 181. By way of explanation, he stated: "In the sense that I was a spy for the Israeli/SLA forces in South Lebanon from 1997 until Israel's departure in 2000. Since then, persecution of me and others like me has been ongoing in Lebanon, both by government authorities and by Hezbollah forces." Aldarwich answered "[n]o" when asked whether "you or your family members continue to participate in any way in these organizations or groups." *Id.*

The CAR indicates that Aldarwich, through counsel, submitted a brief in support of his asylum claim on August 13, 2003. *See id.* at 106–16. In that brief, Aldarwich stated Israeli

Defense Forces ("IDF")-South Lebanese Army ("SLA") operatives recruited him to spy on Hezbollah activities in Southern Lebanon. *Id.* at 108. Aldarwich argued he had a "well-founded fear of persecution because of his political opinion, i.e. he spied for Israel." *Id.* at 111. He further asserted "Hezbollah's henchmen have been looking for [Aldarwich]" and that Hezbollah members searched for Aldarwich and approached his family members. *Id.* Aldarwich's family members received death threats in which Aldarwich was singled out for assassination. *Id.* Along with the brief, Aldarwich submitted several news reports and intelligence bulletins, *id.* at 117, including one entitled, "Lebanese Judge Calls for Execution of Israeli Spies," *id.* at 137. He also submitted a U.S. Department of State Lebanon Country Report, an Amnesty International Report on Lebanon, and an attestation by his father. *See id.* at 148. The U.S. Department of State Report stated, "[u]ntil May 2000, Israel exerted control in or near its self-proclaimed 'security zone' in the south through direct military action and support for its surrogate, the South Lebanon Army." *Id.* at 149.

The record also indicates the government submitted a brief in opposition to Aldarwich's request for asylum. *Id.* at 25–32. The government argued Aldarwich could not meet his burden of proof for asylum and related remedies, stating, *inter alia*, "the U.S. Department of State has reported for the past several years that former members of the South Lebanese Army have not been harassed by either Hizballah or by the Lebanese government." *Id.* at 29. The government also contended Aldarwich could not establish a well-founded fear of persecution, nor could he establish that internal relocation in Lebanon would be unreasonable. *Id.* at 30–32. In support of their brief, the government submitted copies of the 2003 State Country Report on Human Rights Practices for Lebanon and Congressional Research Services Issue Brief on Lebanon. *Id.* at 33.

On June 10, 2004, the immigration court granted Aldarwich's application for asylum, but did not reach his application for withholding of removal. *Id.* at 13, 24.

## 2.   Adjustment-of-Status Application

On July 25, 2005, Aldarwich filed a Form I-485, Application to Register Permanent Residence or Adjust Status ("Form I-485" or "Adjustment-of-Status Application"), pursuant to

8 U.S.C. § 1159(b). *Id.* at 4–7. In support of his Adjustment-of-Status Application, he filed a Form G-325 Biographic Information Sheet, a copy of his Form I-94 Arrival/Departure Record, the immigration court order granting his application for asylum, and the requisite photo. *Id.* at 9. USCIS requested an updated and properly completed Biographic Information Sheet and a completed medical examination form. *Id.* at 16. Aldarwich provided the additional information on December 22, 2005. *Id.* at 19.

On January 8, 2013 – over seven years after Aldarwich filed his Form I-485 – USCIS denied Aldarwich's Adjustment-of-Status Application. *Id.* at 1–3. In that written decision, USCIS concluded the "South Lebanese Army meets the definition of an undesignated terrorist organization [under 8 U.S.C. § 1182(a)(3)(B)(vi)(III)] during the time that you acted as an informant for the SLA." *Id.* at 2. USCIS also explained how it arrived at that conclusion. Specifically, USCIS, quoting from a 2009 UK Border Agency Operational Guidance Note on Lebanon, stated:

> The South Lebanon Army was an armed militia founded and led by South Lebanese Christians (some of its militia men were Muslim or Druze) and financed and trained by Israel with a view to control the so-called Israeli-occupied 'security zone' in the South of Lebanon. Human Rights Watch has documented SLA practices in the occupied zone that were in contravention of international humanitarian law, including forced recruitment of men and children into the militia, the expulsion of individuals and entire families, and the torture of detainees held without charge in Khiam prison.

*Id.* (internal quotation marks omitted). Further, USCIS relied on the U.S. Department of State's 1999 Country Report on Human Rights Practices:

> Artillery and aerial attacks by the various contending forces in parts of south Lebanon threaten life and property. These forces continue to commit abuses, including killings, bombings, and abductions. The SLA maintains a separate and arbitrary system of justice in the Israeli-controlled zone, which

is independent of Lebanese central authority. During the year, SLA officials arbitrarily arrested, mistreated, and detained persons, and regularly expelled local residents from their homes in the zone.

*Id.* (quoting USDOS, 1999 Country Reports on Human Rights Practices, Lebanon) (internal quotation marks omitted).

Ultimately, USCIS found Aldarwich inadmissible: "Consequently you are inadmissible under [8 U.S.C. § 1182(a)(3)(B)(i)(I)] for having engaged in terrorist activity as defined by [8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd)] when you gave material support to the South Lebanese Army by providing them with information about Hezbollah and other opponents of Israel." *Id.* at 2–3.[4] USCIS also concluded Aldarwich was not eligible for "exercises of the Secretary of Homeland Security's discretionary exemption authority" under § 1182(d)(3)(B). *Id.* at 3.

### C. Prior Procedural History in the District Court

On September 6, 2012, Aldarwich filed a Complaint for a Writ in the Nature of Mandamus to Compel Administrative Action and Declaratory Relief against Gerald Heinauer, Director of the USCIS, Nebraska Services Center (SA CV 12-1463-CJC-RNB Dkt. 1). On February 22, 2013, Judge Cormac J. Carney dismissed Aldarwich's complaint for lack of jurisdiction. Order Granting Defendant's Motion to Dismiss (SA CV 12-1463-CJC-RNB Dkt. 10). Aldarwich appealed. Notice of Appeal (SA CV 12-1463-CJC-RNB Dkt. 11). The Ninth Circuit affirmed the dismissal of the complaint,[5] but also stated, "[g]iven the final agency action, Aldarwich is not barred from now asserting that USCIS improperly granted his adjustment-of-status application on non-discretionary grounds." *Aldarwich v. Hazuda*, 593 Fed. Appx. 654, 655 (9th Cir. 2015) (citing *Mamigonian v. Biggs*, 710 F.3d 936, 946 (9th Cir. 2013)).

---

[4] In its decision, USCIS included additional details about Aldarwich's involvement with the South Lebanese Army: "On your I-589, Application for Asylum, you stated that you acted as informant for the South Lebanese Army . . . in south Lebanon from 1997 to 2000," and that "[w]hile acting as an informant you provided information to the South Lebanese Army (also known as the South Lebanon Army) about Hezbollah and other opponents of Israel." CAR 2.

[5] The Ninth Circuit concluded Aldarwich's request to adjudicate his Adjustment-of-Status Application and declare he was not inadmissible "became moot when the USCIS denied the application during the district court proceedings." *Aldarwich v. Hazuda*, 593 Fed. Appx. 654, 655 (9th Cir. 2015) (citing *Mamigonian v. Biggs*, 710 F.3d 936, 942 (9th Cir. 2013)). The Ninth Circuit also stated "the district court and this court lack jurisdiction to review the discretionary denial of the adjustment of status application." *Id.*

### D. Procedural History

On May 13, 2015, Plaintiff filed the Complaint for a Writ in the Nature of Mandamus to Compel Administrative Action and Declaratory Relief against Defendant Mark Hazuda, Director of the USCIS, Nebraska Service Center, in this Court. *See generally* Compl. Plaintiff filed his Motion for Summary Judgment on December 9, 2015, and Defendant filed its Motion on January 14, 2016. Plaintiff opposed Defendant's Motion on January 28, 2016 (Dkt. 27). Defendant replied on February 22, 2016 (Dkt. 28).

## II.   Jurisdiction

Before reaching the parties' substantive arguments, the Court must determine whether it has jurisdiction over this case. *See Cabaccang v. U.S. Citizenship & Immigration Servs.*, 627 F.3d 1313, 1315 (9th Cir. 2010).

Federal courts are courts of limited jurisdiction, and have "only that power authorized by Constitution and statute . . . which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 114 S. Ct. 1673 (1994)). As a court in the Eastern District of California recently emphasized:

> [W]hile there is a "strong presumption in favor of judicial review of administrative action," *I.N.S. v. St. Cyr*, 533 U.S. 289, 298, 121 S. Ct. 2271, 150 L. Ed. 2d 347 (2001), there is heightened "judicial deference to the Executive Branch . . . in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations," *I.N.S. v Aguirre-Aguirre*, 526 U.S. 415, 425, 119 S. Ct. 1439, 143 L. Ed. 2d 590 (1999) (internal quotation marks omitted).

*Mugomoke v. Hazuda*, No. 13-CV-00984-KJM-KJN, 2014 WL 4472743, at *2 (E.D. Cal. Sept. 11, 2014)

Under the Administrative Procedure Act ("APA"), agency action is subject to judicial review when it is (1) made reviewable by statute, or (2) a "final" action "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. "No statute authorizes judicial review over denials of status adjustment." *Cabaccang*, 627 F.3d at 1315. With respect to the second prong,

however, the Ninth Circuit has held that "[w]ithout a pending removal proceeding, a denial of status adjustment is final because there is no appeal to a superior administrative authority." *Id.* at 1317. Further, the Ninth Circuit has concluded that "the district courts maintain jurisdiction to review challenges to adjustment-of-status denials that were decided on nondiscretionary grounds despite the jurisdiction-stripping provisions of the REAL ID Act." *Mamigonian*, 710 F.3d at 942; *see also Aldarwich*, 593 Fed. Appx. at 655.

Because USCIS denied Aldarwich's Adjustment-of-Status Application, there has been a final agency action. *See Mamigonian*, 710 F.3d at 946. Further, Aldarwich asserts USCIS improperly denied his Adjustment-of-Status Application on nondiscretionary (rather than discretionary) grounds. Accordingly, the Court has jurisdiction to review USCIS's determination. *See Aldarwich*, 593 Fed. Appx. at 655 ("Given the final agency action, Aldarwich is not barred from now asserting that the USCIS improperly denied his adjustment-of-status application on nondiscretionary grounds.") (citing *Mamigonian*, 710 F.3d at 946).

### III. Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under the APA, however, the district court's review of an agency's decision is usually limited to the administrative record. 5 U.S.C. § 706; *see also Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (when reviewing final agency action, the district court is not managing a "garden variety civil suit," but rather "sits as an appellate tribunal"). The usual "genuine dispute of material fact" standard for summary judgment does not apply in an APA case. *San Joaquin River Group Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1083–84 (2011). Rather, summary judgment functions as a mechanism for determining as a matter of law whether the administrative record supported the agency's decision and whether the agency complied with the APA. *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).

In reviewing an administrative decision under the APA, "there are no disputed facts that the district court must resolve." *Occidental Eng'g Co*, 753 F.2d at 769. Instead, "the function of

the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.*; *see also City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997). "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental*, 753 F.2d at 770.

A reviewing court may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In evaluating whether an agency's decision should be reversed under the APA's arbitrary and capricious standard, "[courts] ask whether the agency 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *Natural Res. Def. Council v. U.S. Dep't of the Interior*, 113 F.3d 1121, 1124 (9th Cir. 1997) (quoting *Pyramid Lake Pauite Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1414 (9th Cir. 1990)). The standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000).

The interpretation of the Immigration and Nationality Act ("INA") by USCIS "is entitled to deference and should be accepted unless demonstrably irrational or clearly contrary to the plain meaning of the statute." *Occidental,* 753 F.2d at 768 (citation and internal quotation marks omitted). However, "it is 'an abuse of discretion for . . . [USCIS] to act if there is no evidence to support the decision or if the decision was based on an improper understanding of the law.'" *Khan*, 2016 WL 429672, at *5 (quoting *Kazarian v. U.S. Citizenship & Immigration Services*, 596 F.3d 1115, 1118 (9th Cir. 2010)).

## IV. Discussion

Plaintiff contends that, in granting his application for asylum, the IJ necessarily determined Plaintiff's involvement with the Southern Lebanese Army did not constitute engaging in terrorist activity and thus did not render him statutorily ineligible for an adjustment of status. *See* Pl. Mot. at 4, 9. Therefore, Plaintiff argues, under the doctrine of collateral estoppel, Defendant is precluded from finding Plaintiff inadmissible on the grounds he engaged

in terrorist activity with the Southern Lebanese Army. *See id.* at 11–12. Defendant urges the Court to reject this argument for two reasons. First, Defendant asserts that collateral estoppel does not apply where the INA requires USCIS to conduct a new examination to determine an applicant's admissibility. Def. Mot. at 10. Second, Defendant contends that, even if collateral estoppel applies, Aldarwich has failed to satisfy all the elements of collateral estoppel. *See id.* at 14. The Court will address each argument in turn.

### A. Whether Collateral Estoppel Applies to USCIS's Adjudication of an Adjustment-of-Status Application

As a threshold matter, the Court must first address whether collateral estoppel applies to USCIS's adjudication of an adjustment-of-status application. "Congress is understood to legislate against a background of common-law adjudicatory principles." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). Thus, "the Supreme Court has held that there is a presumption that Congress intended for well-established common-law principles, such as collateral estoppel, to apply to decisions of administrative agencies." *Khan*, 2016 WL 429672, at *6 (citing *Astoria*, 501 U.S. 104, 108); *see also Univ. of Tenn. v. Elliott*, 478 U.S. 788, 798 (1986) ("We have previously recognized that it is sound policy to apply principles of issue preclusion to the factfinding of administrative bodies acting in a judicial capacity."). The Ninth Circuit has also stated that "[i]ssue preclusion applies to immigration proceedings." *Belayneh v. I.N.S.*, 213 F.3d 488, 492 (9th Cir. 2000).

The presumption that Congress legislated with common law adjudicatory principles in mind applies "except when a statutory purpose to the contrary is evident." *Astoria*, 501 U.S. at 108. "In other words, absent a legislative intent to the contrary, the Court should presume that common-law principles such as collateral estoppel, apply to the decisions of USCIS." *Khan*, 2016 WL 429672, at *6. Legislative intent to bar collateral estoppel does not require a "clear statement" to that effect; instead, it can be inferred from the plain language of the statute. *Id.* (citing *Astoria*, 501 U.S. at 108).

Defendant concedes that the governing statute in this case – the INA – does not contain an express provision mandating that USCIS adopt particular preclusion principles. *See* Def.

Mot. at 12. However, Defendant argues it is apparent from the language and structure of the INA that Congress did not intend for administrative collateral estoppel to apply. *Id.* at 11. In particular, Defendant emphasizes that 8 U.S.C. § 1159(b)(5) states that, in adjudicating an adjustment-of-status application, USCIS must determine whether an applicant is eligible for admission to the United States "*at the time* of examination for adjustment" (emphasis added). Defendant asserts that, regardless of any earlier asylum proceedings, the language "at the time" requires USCIS to conduct an entirely new inquiry into the asylee's admissibility when he or she applies to become a permanent resident. *Id.* at 12–13. Defendant also contends that applying collateral estoppel in this case "would serve to limit the government's ability to manage its own administrative docket and set reasonable limitations on its procedures." *Id.* at 13.

The Court recognizes that "the INA envisions a two-step inquiry whereby an applicant's admissibility to the United States is evaluated both when they apply for asylum and when they apply for permanent residency." *Khan*, 2016 WL 429672, at *6. However, the Court also agrees with the court in *Khan*, which concluded the following: "that Congress intended for applicants to be evaluated twice does not, in and of itself, suggest that Congress intended to bar the application of collateral estoppel—particularly given that there is a presumption that collateral estoppel *should* apply to the decisions of administrative agencies." *Id.*

Further, "the purpose of having a two-step inquiry is not to give the government two bites at the apple." *Id.* at *7. Rather, "the purpose of the second inquiry is to evaluate any new circumstances that may have arisen or any new facts that have come to light during the one year period applicants are required to wait between when they are granted asylum and when they apply for permanent residency." *Id.*; *see also Islam v. U.S. Dep't of Homeland Sec.*, No. 14-CV-05326-RS, 2015 WL 5653548, at *5 (N.D. Cal. Sept. 25, 2015). ("[T]he two-step process is not indicative of the legislative intent to bar collateral estoppel. . . . "The one year wait time is a trial period to allow the government to assess how an asylee adjusts to the United States. The second step is to evaluate any new information or problems that may have arisen in that year."). Thus, "were new circumstances to arise during the year after [Aldarwich] was granted

asylum, USCIS could consider those circumstances in ruling on his application for permanent residency." *Khan*, 2016 WL 429672, at *7; *see also Islam*, 2015 WL 5653548, at *5. For example, "if new evidence were to come to light regarding [Aldarwich's] involvement with the [Southern Lebanese Army]" and his purported involvement with terrorist activities, "USCIS might have cause to reevaluate [Aldarwich's] admissibility." *Khan*, 2016 WL 429672, at *7; *see also Islam*, 2015 WL 5653548, at *5 ("Defendant's interpretation of the phrase 'at the time' in 8 U.S.C. § 1159(a)(2)(b)(5) as reflecting Congress's intent to foreclose collateral estoppel is unwarranted. As plaintiff points out, a change in facts or circumstances would make it necessary for a judge to reevaluate an asylee's admissibility at the time of examination for adjustment. For example, if new facts arose that were not known to the IJ in Islam's asylum proceeding about his involvement in terrorist activities, then it would be necessary to reevaluate his admissibility under § 1182(a).").

However, in cases like this, where there were no new allegations of involvement in terrorist activity after Aldarwich's asylum application was granted, "permitting the same issue to be adjudicated twice would only cause inefficiency and potentially result in inconsistent decisions." *Khan*, 2016 WL 429672, at *7. [6] These are the exact harms collateral estoppel is intended to prevent – wasted judicial resources, unfairness to parties who have already fully litigated in issue, and inconsistent decisions. *Id.*; *see also Islam*, 2015 WL 5653548, at *5.

In addition, as the *Khan* court noted:

> Defendant['s] argument is also undermined by the fact that USCIS's
> evaluation of an application for adjustment of status involves a number of
> bars to admissibility that do not apply when an application applies for
> asylum. Specifically, section 1158—which governs applications for
> asylum—contains six statutory bars for which an IJ must deny an

---

[6] The Court is not persuaded by Defendant's arguments that estoppel does not apply because the "same rules are not stringently applied against the government," Def. Mot. at 14 (citing *Lavin v. Marsh*, 644 F.2d 1378, 1383 (9th Cir. 1981)), and that "estoppel will not run against the government if the party claiming it has 'not lost any rights to which [he was] entitled,'" *id.*(quoting *Sulit v. Schiltgen*, 213 F.3d 449, 454 (9th Cir. 2000)). First, the cases on which Defendant relies involve the application of equitable estoppel rather than collateral estoppel. Moreover, as discussed above and throughout this Order, the courts in *Khan*, *Islam*, and *Amrollah v. Napolitano*, 710 F.3d 568 (5th Cir. 2013), have all found collateral estoppel applies against the government in this particular context.

application for asylum. These include: (1) the alien has participated in the persecution of any person; (2) if the alien has been convicted of a particularly serious crime; (3) if there are reasons for believing that the alien has committed a serious nonpolitical crime outside the United States; (4) if there are reasonable grounds for regarding the alien as a danger to the security of the United States; (5) if the alien has engaged in terrorist activity; and (6) if the alien was firmly resettled in another country prior to arriving in the United States. 8 U.S.C. § 1158(b)(2)(A)(i)–(vi).

By contrast, section 1158—which governs applications for adjustment of status—incorporates section 1182, which is the INA's general provision regarding the classes of aliens who are ineligible for visas or admission to the United States. 8 U.S.C. § 1159(c). Section 1182 sets forth multiple expansive categories under which an alien may be deemed inadmissible to the United States. These categories include, *inter alia*, health-related grounds, criminal-related grounds, persons who are likely to become a public charge, and a host of "miscellaneous" grounds. 8 U.S.C. § 1182(a)(1)–(10). Notably, for purposes of this action, under section 1182, "terrorist activities" is listed as only one basis for inadmissibility within the broader category of "Security and related grounds." Id. § 1182(a)(3)(B). While none of these grounds are implicated in the instant case, theoretically, USCIS can consider each of these additional bars to admissibility when an applicant applies for an adjustment of statu[s].

Accordingly, the INA envisions a much more expansive inquiry when an applicant applies for an adjustment of status to permanent resident. Thus, even if the IJ's findings during the asylum proceedings are given preclusive effect, that does not defeat the purpose of the two-step inquiry because

USCIS can still consider the numerous other grounds for admissibility that
do not apply when an applicant applies for asylum. And, as already stated,
USCIS can consider whether any new circumstances

*Khan*, 2016 WL 429672, at *7; *see also Islam*, 2015 WL 5653548, at *5.

Finally, in addition to the courts in *Khan* court and *Islam*, other courts outside of this Circuit have also applied principles of collateral estoppel to administrative decisions under § 1158 and § 1159. For example, in *Amrollah v. Napolitano*, the Fifth Circuit applied collateral estoppel and held the IJ's decision to grant the plaintiff's asylum application precluded USCIS from denying the plaintiff's adjustment-of-status application on the grounds that the plaintiff engaged in terrorist activities. 710 F.3d 568, 571–72 (5th Cir. 2013); *see also Sile v. Napolitano*, No. 09C5053, 2010 WL 1912645, at *4 (N.D. Ill. May 12, 2010). And, as noted above, the Ninth Circuit has held that "[i]ssue preclusion applies to immigration proceedings." *Belayneh*, 213 F.3d at 492.

The Court notes that one court in the Eastern District of California has concluded that, in light of the two-step evaluation process for obtaining permanent residency, it would "contravene the legislated process" to apply collateral estoppel to decisions made pursuant to § 1158 and § 1159. *Mugomoke v. Hazuda*, No. 13-CV-00984-KJM-KJN, 2014 WL 4472743, at *7 (E.D. Cal. Sept. 11, 2014). However, the Court finds the reasoning in *Khan* and *Islam* more persuasive. For the reasons set forth above, "the Court finds that the application of collateral estoppel to sections 1158 and 1159 does not contradict the legislative purpose in having a two-step evaluation process for obtaining permanent residency." *Khan*, 2016 WL 429672, at *8 n.5. Moreover, the decision in *Mugomoke* is distinguishable because, unlike in the instant case and in *Amrollah*, the plaintiff in *Mugomoke* did not obtain asylum as a result of an IJ's ruling. *Mugomoke*, 2014 WL 4472743, at *8. Rather, the *Mugomoke* plaintiff's asylum application was granted by the asylum office. *Id.* The *Mugomoke* court concluded the case before it was different from *Amrollah* precisely for this reason, emphasizing that, "[o]n appeal, the Fifth Circuit began its analysis by noting that '[a] final decision by an [IJ] has a preclusive effect on future litigation and agency decisions,'" and that the Fifth Circuit concluded "'the IJ's finding

had a 'preclusive effect against a subsequent finding.'" *Id.* (quoting *Amrollah*, 710 F.3d at 572–73).

For the foregoing reasons, the Court concludes "that neither the plain language of sections 1158 and 1159, nor the statutory framework of the INA, indicates a congressional intent to bar the application of collateral estoppel." *Khan*, 2016 WL 429672, at *8. Thus, the Court must now determine whether the elements of collateral estoppel have been met in this case.

### B. Whether Plaintiff Has Satisfied the Elements of Collateral Estoppel

"Collateral estoppel applies to a question, issue, or fact when four conditions are met: (1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012) (citing *Montana v. United States*, 440 U.S. 147, 153–54 (1979)). Here, Defendant only disputes that Aldarwich has met the first two elements of collateral estoppel. Def. Mot. at 15. The Court will address Defendant's arguments in turn.

#### 1.    Actually Litigated and Decided

For collateral estoppel to apply, Plaintiff must show "the estopped issue is identical to an issue already litigated and that the issue must have been decided in the first case." *Islam*, 2015 WL 5653548, at *3 (citing *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir. 1997)). In arguing the issue was not actually litigated and decided, Defendant emphasizes that, "[w]hile inadmissibility under 8 U.S.C. § 1182(a)(3)(B) would have been a bar to receiving asylum when [Aldarwich] received asylum in June 2004, and [Aldarwich's] admissibility under 8 U.S.C. § 1182(a)(3)(B) was, thus, a necessary and critical part of the decision to grant asylum, the administrative record does not indicate that the terrorism inadmissibility bars were considered by the immigration judge." Def. Mot. at 14; *see id.* at 16 ("[T]he record provides no indication that the immigration judge based his determination on whether the SLA was a terrorist organization and whether [Aldarwich] was inadmissible for providing material support to the SLA."). The Court agrees that, although Aldarwich's brief

-18-

stated he had been a spy for the IDF-SLA, *see, e.g.*, CAR 108–11, and the government's brief discussed those assertions, *see id.* at 25–32,[7] the IJ did not make an express finding regarding whether Aldarwich was statutorily ineligible on the basis of engaging in a terrorist activity, *see id.* at 24. Defendant contends this lack of an explicit determination concerning Aldarwich's admissibility means the Court should decline to apply collateral estoppel in this case. Def. Mot. at 18.

Generally, "collateral estoppel can only apply to issues where there was an express finding on the allegation for which preclusion was sought." *Islam*, 2015 WL 5653548, at *3 (citing *In re Harmon*, 250 F.3d 1240, 1247 (9th Cir. 2001)). However, under Ninth Circuit law, "the express finding requirement can be waived if the court in the prior proceeding necessarily decided the issue." *In re Harmon*, 250 F.3d at 1248. "As a conceptual matter, if an issue was necessarily decided in a prior proceeding, it was actually litigated." *Id.*; *see also Clark v. Bear Stears & Co.*, 966 F.2d 1318, 1321 (9th Cir. 1992) ("When the issue for which preclusion is sought is the only rational one the factfinder could have found, then that issue is considered foreclosed, *even if no explicit finding of that issue has been made*.") (emphasis added)).

Following the reasoning of the court in *Khan*, the Court concludes that, while the IJ did not make an express finding regarding whether Aldarwich had engaged in terrorist activity, "that issue was 'necessarily' decided during [Aldarwich's] asylum proceeding." *Khan*, 2016 WL 429672, at *8. As the *Khan* court explained:

> [U]nder the statutory framework of the INA, before an IJ may grant asylum he or she *must* determine that none of the statutory bars to admissibility applies to the application. See 8 U.S.C. § 1158(b)(2). One of these statutory bars applies if the applicant has engaged in "terrorist activity." 8 U.S.C. § 1158(b)(2)(A)(v).

*Id.* Thus, "before the IJ could grant [Aldarwich's] application for asylum he was required to determine that [Aldarwich] had not engaged in 'terrorist activity.'" *Id.* If the IJ had determined Aldarwich's involvement in the SLA constituted terrorist activity, the IJ would have been

---

[7] Although the government discussed Aldarwich's contention that he was a spy for the IDF-SLA, the government did not raise the issue of inadmissibility in its brief to the immigration court. *See* CAR 25–32.

statutorily precluded from granting Aldarwich asylum. *See id.* Therefore, this issue was necessarily litigated and decided during Aldarwich's asylum proceeding. *See id.*

In addition to *Khan*, in which the court found that "while neither the IJ nor the [Board of Immigration Appeals] made an express finding regarding whether Khan had engaged in terrorist activity, that issue was 'necessarily' decided during Khan's asylum proceeding," *Khan*, 2016 WL 429672, at *8, at least two other courts have reached the same conclusion. In *Islam*, the plaintiff fled Pakistan in 2000 and applied for asylum in the United States. *Islam*, 2015 WL 5653548, at *9. During the asylum proceedings, the plaintiff acknowledged he was involved with the Muttahida Quomi Movement-Altaf Faction ("MQM—A") and the All Pakistan Mohajir Students Organization ("APMSO"). *See id.* at *2 n.1. Ultimately, an IJ granted the plaintiff's application for asylum. *Id.* at *1. One year later, the plaintiff applied with USCIS for an adjustment of status to permanent resident. *Id.* However, the USCIS determined the plaintiff was ineligible for an adjustment of status because he had engaged in a terrorist activity – his involvement with APMSO and MQM—A. *Id.* The plaintiff appealed the denial, arguing that USCIS should be collaterally estopped from denying his application on the grounds that he engaged in a terrorist activity. *Id.* at *2. In response, the defendants emphasized "the IJ's opinion never mentioned the relevant statute, 8 U.S.C. § 1182 [defining 'terrorist activity']" and "neither the IJ nor the [Board of Immigration Appeals] in granting [the plaintiff] asylum relied on the absence of any terrorist activity." *Id.* at *3. The defendants therefore contended the issue had not been actually litigated. *Id.*

The *Islam* court rejected this argument and found for the plaintiff. Specifically, the court reasoned, "[b]ecause the IJ was statutorily barred from granting Islam asylum if he was found to have participated in terrorist activity, that issue was necessarily decided when the IJ did in fact grant Islam asylum." *Id.* Thus, the *Islam* court "found that it was not necessary for the IJ to have made an expr4ess finding that the plaintiff did not engage in terrorist activity, because under the statutory framework such a finding was inherent in the decision to grant asylum." *Khan*, 2016 WL 429672, at *9 (discussing the *Islam* court's findings).

Similarly, in *Amrollah*, the plaintiff fled Iran in 1998 and applied for asylum in the United States. *Amrollah*, 710 F.3d at 570. In his application for asylum and during his asylum hearing, the plaintiff acknowledged he had provided support for the mujahedeen movement in Iran. *Id.* An IJ granted the plaintiff's application for asylum. *Id.* A year later, the plaintiff applied for an adjustment of status to permanent resident. *Id.* After several delays, the government denied the plaintiff's application based on the support the plaintiff had provided to the mujahedeen movement. *Id.* On appeal, the plaintiff argued the government should have been collaterally estopped from denying his application because the IJ had already, and necessarily, determined his support for the mujahedeen movement did not constitute terrorist activity when the IJ granted the plaintiff's application for asylum. *Id.* at 571. The Fifth Circuit agreed with plaintiff, stating that, under these circumstances, the actually litigated prong was "easily satisfied." *Id.* The Fifth Circuit explained:

> [T]he immigration judge was not permitted to grant asylum to [the plaintiff] if he satisfied any of the exceptions to admissibility under § 1182, including providing material support to any individual or organization that engaged in terrorist activities. In other words, the IJ's ruling that Amrollah was admissible necessarily included, under the structure of the statute, a finding that Amrollah did not provide support to an individual or organization that engaged in terrorist activities.

*Id.* at 571 (citation omitted). The Court finds the reasoning in *Khan*, *Islam*, and *Amrollah* persuasive.

Nonetheless, Defendant argues that *Islam* and *Khan* are distinguishable because, unlike in those cases, the record here does not indicate the IJ considered Aldarwich's inadmissibility on terrorism-related grounds. *See* Def. Mot. at 17–18. The Court disagrees this is a distinguishing feature. In addressing the same argument Defendant raises here, the court in *Khan* emphasized, "it is not clear that this factor [evidence in the record] was essential to the decisions in either *Islam* or *Amrollah*." *Khan*, 2016 WL 429672, at *9. Rather, the *Islam* and *Amrollah* courts – as well as the *Khan* court – "explained in great detail how, under the

statutory framework of the INA, the decision to grant an application for asylum necessarily entails a determination that the applicant has not engaged in terrorist activity." *Id.* [8]

Moreover, even if the IJ did not address Aldarwich's involvement in terrorist activity, as discussed above, Aldarwich did reference his involvement in the SLA in his answers to multiple questions on his Form I-589, CAR 180–81, and in his brief to the immigration court, *id.* 108–11. Indeed, one of the bases for Aldarwich's application for asylum was that he feared persecution in Lebanon because he spied for Israel on behalf of the IDF-SLA. *See id.* at 109–11; *id.* at 180–81. Thus, Aldarwich's involvement with the SLA was raised during his asylum proceeding.[9]

The Court also concludes *Mugomoke* is distinguishable from the instant case. In *Mugomoke*, the court stated that (even if collateral estoppel applied), "[t]o satisfy the second element [that the issue was actually litigated and decided in prior proceedings], it must be shown that the prior proceeding was adjudicative and adversarial in nature." *Mugomoke*, 2014 WL 4472743, at *8–9. The court found plaintiff failed to satisfy the second element because the "plaintiff has not shown that his asylum interview was adjudicative and adversarial in nature." *Id.* at *9. Indeed, the plaintiff did not obtain asylum as a result of an IJ's ruling; rather, the asylum office granted plaintiff's asylum application. *Id.* As the *Mugomoke* court noted –

---

[8] Defendant also argues the Ninth Circuit "employs a more limited application of collateral estoppel than the Fifth Circuit's interpretation in *Amrollah*." Def. Mot. at 17. Specifically, Defendant asserts that, "[r]ather than assuming a previous action 'necessarily included' a finding on this issue, the Ninth Circuit requires an examination of the record of proceeding and a determination that the factfinder could not have reached its decision on other grounds." *Id.* (citing *Clark*, 966 F.2d at 1321 ("We must decide whether a rational factfinder could have reached a conclusion based upon an issue other than that which the defendant seeks to foreclose.")). However, as the court in *Khan* stated in response to an identical argument: "[T]hat is precisely what occurred here. As explained above, the IJ 'could not have reached his decision' to grant [Aldarwich] asylum *unless* he determined that [Aldarwich] had not engaged in a terrorist activity." *Khan*, 2016 WL 429672, at *10 n.6. Further, the Ninth Circuit "has recognized that in issue may have been necessarily decided by implication." *Id.* (citing *Clark*, 966 F.2d at 1321; Moore's Federal Practice—Civil §132.03[3][e] (Matthew Bender 3d ed.)).

[9] Defendant also emphasizes that asylum is relief from removal and not an "admission," and that USCIS was seeking a first review of whether Aldarwich should be admitted to the United States. Def. Reply at 6–7; *see id.* at 2–6. Defendant further states that Aldarwich's "inadmissibility is one of several 'exceptions' that should have precluded him from asylum, *see* 8 U.S.C. § 1158(b)(2)(A) (defining 'exceptions'), but . . . the immigration court failed to consider the exception defined under 8 U.S.C. § 1158(b)(2)(A)(v), and USCIS should not be precluded from considering whether [Aldarwich] is inadmissible when determining whether he should be admitted to the United States." *Id.* at 7. The Court is unpersuaded by Defendant's reasoning. First, as discussed above, the Court, following *Khan* and *Islam*, has concluded that "the issue of whether [Aldarwich] was inadmissible as an asylee was necessarily decided" during Aldarwich's asylum proceedings "because he was given asylum and none of the inadmissibility bars in 8 U.S.C. § 1182 applied to him (if they did apply, he would have been 'ineligible to be admitted to the United States.')." *Islam*, 2015 WL 5653548, at *3 n.2 (quoting 8 U.S.C. § 1182(a)). Further, the Court notes that the issue of whether or not Aldarwich was "admissible" as a lawful permanent resident was not decided in the asylum proceedings, nor does Aldarwich argue that it was. What is estopped is the issue of whether Aldarwich was involved in terrorist activity with the SLA. *See id.*

quoting a Third Circuit decision – "[t]here can be little doubt that there exists a substantial difference between the procedures employed by the agency official . . . in this case and those governing a [sic] adversarial proceeding conducted by an IJ." *Id.* (quoting *Cospito v. Attorney Gen. of U.S.*, 539 F.3d 166, 171 (3d Cir. 2008)). Here, in contrast, an IJ conducted the asylum proceeding. Further, both Aldarwich and the government were represented during the asylum proceeding.

For the foregoing reasons, the Court finds the issue of Aldarwich's involvement in terrorist activity was actually litigated and decided during his asylum proceeding.

### 2.   Identical Issues

Defendant also contends the issues at stake in asylum and adjustment-of-status applications are not identical. Def. Mot. at 18. Specifically, Defendant argues the applications for asylum and adjustment-of-status are different applications that provide the recipient with very different benefits. *Id.* at 18–19. Defendant also asserts the statute defining a terrorist organization and setting the standard for material support for a terrorist organization changed between when Aldarwich was granted asylum in 2004 and when USCIS adjudicated his adjustment application in 2013. *Id.* at 19. The Court is unpersuaded by Defendant's arguments.

First, the "relevant inquiry is not whether [Aldarwich] would have received different benefits from his application for asylum and his application for adjustment of status." *Khan*, 2016 WL 429672, at *12. Rather, "the question for the Court is whether the IJ and USCIS relied upon the same facts and legal standard when determining whether [Aldarwich] was statutorily ineligible on the grounds that he had engaged in terrorist activity." *Id.*; *see also Amrollah*, 710 F.3d at 572 (citing *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005)).

Therefore, the Court must address whether the changes in the statute preclude collateral estoppel. *Cf. Amrollah*, 710 F.3d at 572 ("The question presented in this appeal is whether the definition of 'engag[ing] in terrorist activity' under the 2010 version of the statute is 'significantly different' or creates a 'demonstrable difference' from the standard in place in 1999, sufficient to preclude collateral estoppel."). As discussed above, 8 U.S.C.

§ 1182(a)(3)(B)(iv)(VI)(dd) is the only section under which USCIS found Plaintiff inadmissible based on his activities with the SLA. *See* CAR 2–3 ("Consequently you are inadmissible under INA section 212(a)(3)(B)(i)(I) for having engaged in terrorist activity as defined by 212(a)(3)(B)(iv)(VI)(dd) when you gave material support to the South Lebanese Army by providing them with information about Hezbollah and other opponents of Israel.").

Relevant here, the statute governing the admissibility of aliens was amended in 2001 by the USA PATRIOT Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001), and the REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 302 (2005). In 2004, when the IJ granted Aldarwich asylum, the relevant portion of the statute defined "engage in terrorist activity" as follows:

> [I]n an individual capacity or as a member of an organization
>
> . . .
>
> (VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives or training
>
> . . .
>
> (dd) to a terrorist organization described in clause (vi)(III), unless the actor can demonstrate that he did not know, and should not reasonably have known, that the act would further the organization's terrorist activity.

8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd). Further, in relevant part, a "terrorist organization" was defined as: "an organization . . . (III) that is a group of two or more individuals, whether organized or not, which engages in the activities described in subclause (I), (II), or (III) of clause (iv)." 8 U.S.C. § 1182(a)(3)(B)(vi)(III).

When Aldarwich's Adjustment-of-Status Application was adjudicated in 2013, the definition of "engage in terrorist activity," was, in relevant part:

> [I]n an individual capacity or as a member of an organization
>
> . . .

(VI) to commit an act that the actor knows, or reasonably should know,

affords material support, including a safe house, transportation,

communications, funds, transfer of funds or other material financial benefit,

false documentation or identification, weapons (including chemical,

biological, or radiological weapons), explosives, or training

. . .

(dd) to a terrorist organization described in clause (vi)(III), *or to any*

*member of such an organization*, unless the actor can demonstrate *by clear*

*and convincing evidence* that the actor did not know, and should not

reasonably have known, *that the organization was a terrorist organization*.

8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd) (emphasis added). Additionally, in relevant part, a

"terrorist organization" means "an organization . . . (III) that is a group of two or more

individuals, whether organized or not, which engages in, *or has a subgroup* which engages in,

the activities described in subclauses (I) through (VI) of clause (iv)." 8 U.S.C.

§ 1182(a)(3)(B)(vi)(III) (emphasis added). Thus, a comparison of the two versions of the statute

reveals that the REAL ID Act altered the material support provision to encompass actors who

provide support to *members* of terrorist organizations. Further, the amendment expanded the

Tier III definition to include a group with a subgroup that engages in terrorist activity. Further,

the REAL ID Act added the requirement that a person show by "clear and convincing

evidence" that he or she "did not know, and should not reasonably have known that the

organization was a terrorist organization."

Like the Fifth Circuit in *Amrollah*, the Court concludes Defendant has not demonstrated

this constitutes a significant change in the law between 2004 and 2013 as applied to

Aldarwich's Adjustment-of-Status Application. Defendant notes there were changes in the law

and highlights the addition of the clear and convincing evidence standard to the lack of

knowledge exceptions relating to activities carried out in affiliation with Tier III organizations.

*See* Def. Mot. at 21. However, Defendant does not cite any case law or legislative history (or

any other source) explaining why these changes are significant in this context. *See Amrollah*,

710 F.3d at 573. For example, as Aldarwich emphasizes, Defendant does not argue there was an allegation or finding that Aldawich provided material support to *members* of a terrorist organization. *See* Pl. Mot. at 7 ("[T]he decision of Defendant denying adjustment of status did not find that Plaintiff provided material support to an individual but rather claimed he provided material support to the South Lebanese Army . . . .") (citing CAR 3). Nor does Defendant specifically assert the addition of "subgroup[s]" to the Tier III definition is relevant here. Finally, the Court concludes the clear and convincing evidence standard, as applied to Aldarwich, does not provide a ground upon which the government can now deny his Adjustment-of-Status Application. The *Khan* and *Amrollah* courts discussed changes in the law, and the court in *Amrollah* quoted the portion of the law – 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd)[10] – that includes the clear and convincing evidence standard. In spite of the addition of the new evidentiary standard in 2005, both courts found the issues at stake in the asylum and adjustment-of-status applications were identical. *See Amrollah*, 710 F.3d at 573 ("By finding Amrollah admissible to the United States in 1999, the immigration judge necessarily decided that Amrollah did not afford material support to any: (i) individual, (ii) organization, or (iii) government in conducting a terrorist activity at any time. The government argues on appeal that Amrollah is inadmissible under the expanded 2010 statute for providing material support to a Tier III terrorist organization—defined as 'a group of two or more individuals, whether organized or not, which engages in, or has a subgroup that engages in' terrorist activity. 8 U.S.C. § 1182(a)(3)(B)(vi)(III). . . . [A]s applied to Amrollah, this proscription does not provide a separate and distinct ground upon which the government can now deny his application."); *Khan*, 2016 WL 429672, at *12. Thus, like the court in *Amrollah*, the Court concludes Defendant has not demonstrated a significant change in the law between 2004 and 2013 as applied to Aldarwich's Adjustment-of-Status Application.

---

[10] It appears the Fifth Circuit may have slightly misquoted 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd). Specifically, the Fifth Circuit states: "unless the *solicitor* can demonstrate," instead of "unless the *actor* can demonstrate" (emphasis added). However, looking to the entire quotation included in *Amrollah* and the fact that Amrollah's application for permanent resident status was denied after the government "concluded that Amrollah had engaged in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd) (2010) by providing material support to a Tier III terrorist organization or the member of such an organization," *Amrollah*, 710 F.3d at 571, the Court concludes the Fifth Circuit intended to quote 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd).

Further, the Court concludes the IJ and USCIS relied on upon the same factual record. Here, as in *Khan* and *Amrollah*, the parties do not dispute that Aldarwich's last involvement with the SLA occurred before he came to the United States in 2002. Accordingly, the Court concludes the government "did not . . . present any additional facts which would make the IJ's ruling distinguishable." *Amrollah*, 710 F.3d at 573. In other words, the IJ and USCIS considered the same factual record when evaluating whether Aldarwich was statutorily barred on the grounds of engaging in terrorist activity. *See Khan*, 2016 WL 429672, at *12.[11] Further, as the court in *Khan* noted, "the definition of 'terrorist activity' is the same when adjudicating an application for asylum and an application for adjustment of status." *Id.*  Indeed, "[b]oth sections 1158 and 1159 incorporate the definition of 'terrorist activities' set forth under 8 U.S.C. § 1182(a)(3)(B)(i)." *Id.*; *see also Amrollah*, 710 F.3d at 571 ("In other words, both 8 U.S.C. § 1158 (the statute governing petitions for asylum) and 8 U.S.C. § 1159 (the statute governing petitions for permanent resident status), look to 8 U.S.C. § 1182 (the statute governing inadmissible aliens) to determine whether an alien is eligible for relief.").

For the foregoing reasons, the Court concludes the issues were identical in both of Aldarwich's proceedings. *See Amrollah*, 710 F.3d at 573 ("Under a plain reading of the text of the statute and the facts of this case, the IJ's 1999 finding that Amrollah did not provide material support to *any* 'individual' *or* 'organization' in conducting a terrorist activity has a preclusive effect against a subsequent finding that Amrollah provided material support to 'a group of two or more individuals' engaged in terrorist activity. The government has provided this court with no reason, whether by legislative history or any other source, to reject this reading."); *see also Khan*, 2016 WL 429672, at *12.

---

[11] In the context of arguing Aldarwich's admissibility was not actually litigated and decided in the removal proceedings such that Aldarwich cannot meet the first element of collateral estoppel, Defendant notes that, in its written order, USCIS cites reports not on the record in Aldarwich's 2004 asylum proceedings. Def. Reply at 12. However, Defendant does not appear to argue the IJ and USCIS did not rely on the same factual record. Indeed, Defendant does not argue Aldarwich had any involvement with the SLA after he came to the United States; in other words, Defendant does not assert that any new circumstances arose during period of time after Aldarwich was granted asylum. *See Khan*, 2016 WL 429672, at *7; *Islam*, 2015 WL 5653548, at *5.

The Court finds Aldarwich satisfied all the elements of collateral estoppel.[12] Thus, the Court concludes Defendant is collaterally estopped from concluding Aldarwich is ineligible for an adjustment to permanent resident on the grounds that he has engaged in terrorist activity.[13]

## V.   Disposition

For the foregoing reasons, the Court finds USCIS is collaterally estopped from denying Plaintiff's Adjustment-of-Status Application on the grounds that he has engaged in terrorist activity. Accordingly, the Court GRANTS Plaintiff's Motion and DENIES Defendant's Motion. USCIS's denial of Plaintiff's Adjustment-of-Status Application is hereby set aside pursuant to 5 U.S.C. § 706.

_David O. Carter_

_____

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

Dated:  March 18, 2016

---

[12] As stated above, Defendant only disputes whether Plaintiff has met the first two elements of collateral estoppel.

[13] The Court also notes USCIS did not adjudicate Aldarwich's Adjustment-of-Status Application for over seven years. Only after an extended period of time did the government conclude – in the absence of any new allegations of involvement in terrorist activity – that Aldarwich was inadmissible due to his involvement with the SLA. The Court recognizes there is heightened "judicial deference to the Executive Branch . . . in the immigration context." *Aguirre-Aguiree*, 526 U.S. at 425. However, both the length of time Aldarwich lived in the United States as an asylee prior to USCIS's decision and the absence of new allegations concerning his involvement with the SLA suggests the need for judicial deference to the Executive Branch is lessened here.